The underlying case concerns an insurance company's duty to defend the insured against a pollution liability action.
In 1991, ABB Industrial Systems, Inc., brought a complaint in federal court against the present plaintiffs, Zero-Max, Inc. and Barry Wright Corp. (hereinafter collectively referred to as "Zero-Max") seeking damages for allegedly polluting certain contaminated property which ABB owned and was responsible for cleaning. Apparently. Zero-Max was the owner of the contaminated site for a period of 13 months from August 1984 to September 1985, prior to conveying the site to ABB.
Faced with ABB's federal court claim, Zero-Max contacted its comprehensive general policy insurer, Liberty Mutual Insurance Company ("Liberty"), and requested that Liberty provide a defense CT Page 16751-A to this action. Liberty denied Zero-Max's request for a defense on the ground that the underlying ABB complaint was outside the policy. Specifically, Liberty asserted that the underlying complaint did not fall into the "sudden and accidental" exception to an exclusion in the policy against any environmental waste claims.
Following Liberty's denial of defense, Zero-Max defended itself against ABB's claim and, subsequently, was granted summary judgment in federal court. Zero-Max has now filed a complaint, based on breach of contract and breach of good faith and fair dealing, against Liberty in which it seeks a declaratory judgment as to Liberty's failure to provide a defense. Both parties have filed their respective motions for summary judgment and agree that any issues as to liability may be decided on these motions.
It is well settled that "an insurer's duty to defend, being much broader in scope and application than its duty to indemnify, is determined by reference to the allegations contained in the [underlying complaint] . . ." (Citations omitted.) SpringdaleDonuts, Inc. v. Aetna Casualty Surety Co., 247 Conn. 801, 807
(1999). "The obligation of the insurer to defend does not depend on whether the injured party will successfully maintain a cause of action against the insured but on whether he has, in his complaint, stated facts which bring the injury within the coverage. If the latter situation prevails, the policy requires the insurer to defend, irrespective of the insured's ultimate CT Page 16751-B liability . . . It necessarily follows that the insurer's duty to defend is measured by the allegations of the complaint . . . Hence, if the complaint sets forth a cause of action within the coverage of the policy, the insurer must defend . . . On the other hand, if the complaint alleges a liability which the policy does not cover, the insurer is not required to defend." Id.
Under Connecticut law, "in assessing whether the allegations of the underlying claim potentially fall within coverage, the insurer is precluded from looking beyond the four corners of the underlying complaint." EDO Corp. v. Newark Ins, Co., 898 F. Sup. 952,961 (D.Conn. 1995). The duty to defend is "not affected by facts disclosed by independent investigation, including those that undermine or contradict the injured party's claim," StamfordWallpaper Co., Inc. v. TIG Ins., 138 F.3d 75 (C.A. 2, 1998). Thus, it is irrelevant to the existence of a duty to defend whether or not the complaint is groundless and whether or not the insurer will eventually be able to establish that it has no duty to indemnify the insured. EDO Corp. v. Newark Ins. Co., supra,898 F. Sup. 962.
The court, accordingly, must now turn to ABB's underlying complaint and the parties' arguments concerning the sufficiency or insufficiency of this complaint as triggering a duty to defend.
Some of the pertinent allegations in the complaint are that: CT Page 16751-C "During the period from 1961 through . . . 1985 [the site] was used primarily as an industrial facility and primarily for the assembly of small instruments and electronic circuitry. On information and belief, all of the owners and operators of the facility from the period of 1961 through September of 1985 used various forms of industrial solvents . . . as well as aromatic volatile organic chemicals in their industrial processes." (ABB Complaint. ¶ 20.)
The complaint continues that "Based on information and belief, the industrial solvents used by owners and operators of the facility were delivered to the facility at the loading dock, and stored nearby prior to use. Subsequent to use, empty barrels or barrels with used waste solvent were at times . . . stored outside of [the site]. Release and discharge of the hazardous substances into the environment at the facility was caused by the owners and operators of the facility between 1961 and 1985." (ABB complaint, ¶ 21.) Moreover, "the site assessment performed by ABB's environmental engineers demonstrates the soils, ground water and bed rock at the . . . site have been contaminated by the discharge, spill or release of . . . solvents." (ABB complaint, ¶ 23.) "Spillage and discharge of these chemicals occurred between 1961 when the facility was built and 1985 . . .and was caused by prior owners and operators of the facility." (ABB complaint, ¶ 24.)
The complaint further alleges that "the actions and inactions CT Page 16751-D of the defendants in their use, handling, storage and disposal of hazardous substances has resulted in the release of hazardous substances and volatile organic chemicals to the environment soils, ground water and bed rock at [the site.[" (ABB complaint, ¶ 26.)
The policy in question contains the following language, the interpretation of which is at the center of the parties' dispute: "This insurance does not apply to bodily injury or property damage arising out of a discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alcohols, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water; but this exclusion does not apply if such discharge, dispersal, release, or escape is sudden and accidental."
Liberty, for its part, argues that the language in the underlying complaint suggests a gradual spillage and discharge of hazardous materials as a result of storage by the various site owners throughout the years. As a result, Liberty argues that there is no conceivable allegation in the complaint that would bring the underlying claim into the "sudden and accidental" exception in the exclusionary language.
Zero-Max, on the other hand, argues that, at worst, the complaint is ambiguous as to the actual cause of contamination CT Page 16751-E and embraces the possibility that pollution may have been caused by a "sudden and accidental" discharge. This mere possibility, according to Zero-Max, is enough to trigger the duty to defend on Liberty's part.
The Connecticut courts have had little opportunity to address the import of the "sudden and accidental" provision in insurance policy exclusions. The courts that have addressed the "sudden and accidental" language have depended on foreign cases to provide the fundamental logic and interpretation of the phrase. SeeLinemaster Switch v. Aetna Life Casualty, Superior Court, judicial district of Hartford/New Britain at Hartford, Docket No. 396432, 15 CONN. L. RPTR. 223 (July 31, 1995) (Corradino, J.) ("[t]here has been a veritable legion of cases trying to interpret this phrase and it has been said that the `the exception to the pollution exclusion for discharges that are sudden and accidental is easily the most often litigated part of the standard pollution exclusion'"). In any event, the Connecticut courts that have addressed "sudden and accidental" have interpreted that phrase as having a temporal significance. See Reichhold Chemicals v. Hartford Accident Indemnity Co.,
Superior Court, complex litigation docket, Middletown, Docket No. 085884, 23 CONN. L. RPTR. 394 (October 1, 1998) (Aurigemma, J.). Thus, Connecticut courts have followed the majority rule that a "sudden and accidental" event must be an abrupt and instantaneous occurrence. Id. The gradual discharge of pollutants over a long period of time thus cannot be a "sudden and accidental" exception CT Page 16751-F to the exclusion clause. See Linemaster Switch v. Aetna Life Casualty, supra, Superior Court, Docket No. 396432, 15 CONN. L. RPTR. 223.
In the present case, the underlying complaint alleges, in general terms, that volatile chemicals were used and stored on the premises from 1961, when the facility was built, to 1985, when the facility was purchased by ABB. The complaint further alleges, again in general terms, that spillage and discharge of these chemicals occurred during this time period. Other than these allegations, the complaint does not contain any specific allegations as to when or how the facility was actually polluted.
Because the complaint is couched in such general language, the court does not believe that the complaint forecloses the possibility that the spillage or discharge of the chemicals occurred in such a way as to fall outside the exclusionary language. That is "the court feels that, at the very least, there is a possibility that the facility was contaminated in a sudden and accidental fashion. See EDO Corp. v. Newark Ins. Co., supra898 F. Sup. 962 ("the broad, general allegations of the [underlying accusations] admit of the possibility that property damage was caused, if even in part, by the sudden and accidental discharge of [the pollutant]") (internal quotation marks omitted); State of N.Y v. Blank, 27 F.3d 783, 791 (C.A.2 (N.Y.) 1994) ("[t]he complaint's broad, general allegations admit of the possibility that property damage was caused, if even in part, by CT Page 16751-G the "sudden and accidental' discharge of pesticides"); but see Stamford Wallpaper Co., Inc. v. TIG Ins., supra, 138 F.3d 81 ("we will not hypothesize or imagine episodes or events that cannot be found among the allegations, and cannot reasonably be deduced from them").
The duty to defend is triggered if an allegation of the complaint falls even possibly within the coverage. Edelman v.Pacific Employers Ins. Co., 53 Conn. App. 54, 59 (1999). (Emphasis in original.) In the present case, the underlying complaint does not provide much illumination as to how the spillage or discharge occurred. One must keep in mind that this review of language is not bringing scrutiny to the pleading of Zero-Max striving to bring itself within coverage. It is, as noted, the language of its former adversary who may well have been ill-informed or non-caring as to the ramifications of its word selection.[1]
See Powers Chemco v. Federal Ins. Co., 74 N.Y.2d 910 (1989) (no sudden and accidental pollution where underlying complaint alleged that defendants buried drums containing waste, dumped waste liquid from drums into open pits and discharged waste through a pipe at the site). The underlying complaint also does not allege that the pollution occurred through the intentional and deliberate policies of the previous owners. See State of N.Y.v. AMRO Realty Corp., 936 F.2d 1420, 1427-28 (C.A.2 (N.Y.) 1991) (where dumping was done deliberately, it cannot be said to be sudden or accidental; moreover, complaint contained an allegation that the discharge of waste occurred over thirty year period). CT Page 16751-H ABB's federal complaint leaves wide open the prospect that during the relevant years a mixture of polluting events occurred, including sudden and accidental spillages, for example in transportation movements, deliveries, etc.
It is true that this allows for the possibility of a difficult sorting exercise by fact-finders; however, this anomaly is no worse in kind than would face an insurer who successfully fends off a request to defend only to later be sent an incontrovertible accidental spill damage verdict.
The court, therefore, finds that Liberty should be deemed to have had a duty to defend Zero-Max against the accusations alleged by ABB. Accordingly, plaintiffs' motion for summary judgment as to the liability of the defendants is granted.